IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

JULIA CORREIA                                                                    PLAINTIFF

VS.                          NO. 17- 6082

GLENN JONES, Individually, and
In His Official Capacity as CHANCELLOR
OF HENDERSON STATE UNIVERSITY                          DEFENDANTS

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED
AUG 2 2 2017
DOUGLAS F. YOUNG, Clerk
By
Deputy Clerk

## COMPLAINT

COMES the Plaintiff, by and through counsel, and for her Complaint, she states:

### PARTIES AND JURISDICTION

Plaintiff is a resident and citizen of the State of Arkansas, who formerly worked as an administrator for the Henderson State University, an instrumentality of the State of Arkansas. Glenn Jones is the Chancellor of Henderson State University, who is sued in his official and personal capacity. Glen Jones is a policymaker in matters such as those encompassed within this Complaint. All actions taken by the Defendant were taken under color of state law. This is an action to redress deprivation of Plaintiff's constitutional rights to free speech, life, liberty, and the pursuit of happiness granted to her by the Arkansas and Federal Constitutions, as allowed by 42 U.S.C. §1983 and the Arkansas Civil Rights Act of 1993. Since the acts giving rise to this matter arose within this Court's district, venue is proper under 28 U.S.C. §1391(b). This Court has subject matter jurisdiction under 28 U.S.C. §1331, as well as supplemental jurisdiction under 28 U.S.C. §1367.

## GENERAL ALLEGATIONS OF FACT

1. Plaintiff worked under an annual contract as a Director with responsibilities for the "Center" and the "English as a Second Language Academy" as well as teaching four (4) ESL endorsement courses through the Teacher's College of HSU, until October of 2014, when Defendant unlawfully terminated her contract. Plaintiff was not an at will employee.

2. Plaintiff performed her job satisfactorily.  State law required her contract to be renewed every year by June 1st.

3. Plaintiff received excellent job evaluations

4. Both the Center and the ESL Academy were separate programs with different funding sources.   Unless otherwise indicated, the items listed throughout the audit report were purchased with academy funds for academy purposes.

5. The Center was the intensive English program for ESL international students to attend ESL classes during the fall and spring semesters.

6. The ESL Academy was the year-round program for Arkansas teachers to earn their ESL endorsement; the face-to-face academy training with teachers occurred

for thirteen days in June.  The rest of the year was layered with post academy tasks and prep for the next.  Every work day involved academy responsibilities.

7. With a near-million dollar budget annually, purchases to meet the needs of the year-round functioning of the ESL Academy process were in alignment with the scope and magnitude of the ESL Academy program.  We avoided waste and replaced items when worn out or broken.  What was not used now would be used later.  The ESL Academy face-to-face teacher-training supplied all materials, supplies, and resources for the presenters and teachers—whatever was needed to make the process and the experience successful.

8. Prior to this review, Dr. Jones apparently contracted with auditing professionals (contractors) to conduct a preliminary review of the Center.

9. In violation of her Due Process rights, clearly established by Rush v. Perryman, no one said the words *audit, professionals, contractors,* or *preliminary review* to the Plaintiff, or even advised Plaintiff she was under investigation.  On the two occasions that the two people who were employees of Arkansas State University appeared, (One being Jo Lunbeck) they never identified their official purpose and never gave Plaintiff notice of her Garrity rights.  They just showed up wearing ASU nametags and said their names.  When they suddenly appeared for the second time, the Plaintiff asked that they set an appointment. Jo Lunbeck said that PLAINTIFF would have to take that up with President Jones.  PLAINTIFF

said that PLAINTIFF would have but that PLAINTIFF had just been informed that he was on vacation.

10. During both encounters, PLAINTIFF did not know the two ASU people were *contracted* and that they were conducting a *preliminary review* for further action; official terms were never used.  The female kept repeating that she was a good friend of President Jones and had "a good working relationship with him" and that "they worked well together."  She stated that President Jones had asked her to check out a few details.  There was no indication that her presence was the beginning of potential legal proceedings.  PLAINTIFF believed, wrongly, she was looking to please President Jones, her friend and colleague.

11. PLAINTIFF was not informed of any of the planning and implementation of her being blindsided and ambushed at the end of the 2014 ESL Academy process.

12. There is a difference between Center funds and Academy funds.  The Center for Language Proficiency, the intensive English program, operated from funds generated from the ESL costs paid for by its ESL students and with the slightly less than $3,000.00 allocated per fiscal year in the HSU budget.  Expenses related to the Center came from Center funds.  Expenses connected to the ESL Academy were taken from Academy funds.

13. As the director of the ESL Academy for twelve years and the coordinator of the Center for Language Proficiency (CLP; the Center) for fourteen years, PLAINTIFF was not interviewed. Nor was she informed of the identities of the "…certain HSU and ADE personnel" who were allegedly interviewed. The ADE personnel should have been (or should have at least included) Dr. Andre Guerrero, director of Programs for Language Minority Students, ADE, who used his budget funds to make the ESL Academies possible for the past twenty-plus years (of which HSU was involved for twelve years—2003-2014). These failures denied Plaintiff Due Process.

14. The Center for Language Proficiency was the intensive English program; anything relating to ESL classes and ESL students was the Center. The Center was founded in 2000, and over the years served ESL students from some twenty-six countries.

15. The ESL Graduate Academy was a totally separate entity which was brought to HSU in 2003, and over the past twelve years served 2,113 Arkansas teachers with its face-to face teacher-training for thirteen days each June.

16. For fourteen years (2000-2014), PLAINTIFF was contracted year-after-year to be the coordinator of the Center as well as to teach the ESL endorsement courses through Teachers College, Henderson. PLAINTIFF also served as director of the

HSU ESL Academy from 2003-2014 (twelve years), but that service was never a part of her work contract.

17. In recognition of her success with the first three ESL Academies, PLAINTIFF was given a two-part pay raise in two fiscal years:  $4,000.00 in January 2005 and $6,000.00 in July 2005.  This pay raise was given when the Academy income was below $500,000.00 annually to HSU.  During the following years after Academy income rose above $500,000.00 with varying annual totals (including school districts' payments) rising upward of $1,000,000.00,

18. PLAINTIFF asked periodically for a corresponding pay increase or a stipend reflective of the continuing increased income and increased workload regarding her academy responsibilities.  Each time VP of Finance Bobby Jones either said that he would *check on it* or he said *no*.  Mr. Bobby Jones knew that PLAINTIFF would do the Academy regardless because he was aware of her work ethic and her passion for the positive outcomes resulting from the Academy.

19. The Administrative Assistant position was funded year-to-year from academy funds.  Technically, she was the academy secretary who also fulfilled duties for the Center.  The Assistant Director position, contingent upon having an ESL Academy, was funded year-to-year through the university budget.  Plaintiff's position was funded through the university budget; her three titles were:  (1) coordinator of the Center for Language Proficiency, (2) director of the ESL

Graduate Academy, and (3) instructor of the ESL endorsement courses through Teachers College, Henderson.

20. Again, the terms *contractors* and *preliminary review* were never said to Plaintiff. Of the two ASU people, the female did the talking. She periodically repeated that she and President Jones were good friends and that they had a good working relationship. She said that they were there to check on a few details for President Jones. After some of her responses to her questions, she would roll her eyes and whisper to the male with her.

21. When the two showed up at the Center on the following Tuesday, July 1, 2014, following the completion of the ESL Academy and the Revisited Days 1-4, they had Amy Hunnewell-Fitzroy, the secretary, opening and unlocking all doors, closets, and buildings for their inspection. Amy, the secretary, did not call to let Plaintiff know of their presence. When PLAINTIFF arrived, PLAINTIFF stated that they should make an appointment and come back when scheduled. The female said that PLAINTIFF would have to discuss that with President Jones. PLAINTIFF said that PLAINTIFF would have done so already but that he is conveniently on vacation and thus not on campus.

22. PLAINTIFF endured the hostile work environment created by the secret investigation and Jo Lunbeck's rolling- of-the-eyes and her biased attitude as PLAINTIFF proceeded to answer her questions. She was definitely out-to-please

her good friend, President Jones, with whom she had a good working relationship (as she stated over and over).  Never was one word relating to *audit*, *contractor*, or *preliminary review* mentioned; she made her presence sound as if she were just there doing a favor for a friend by finding out a few details.  Her entire act was deceptive toward Plaintiff and biased in favor of whatever President Jones was wanting.  Plaintiff was denied Due Process and denied her Garrity rights.

23. Defendant claimed Plaintiff expended $28,570 in lodging for the HSU Band Camp paid from Academy grant funds. PLAINTIFF knew nothing about the Band Camp $28,570.00 until PLAINTIFF read this audit report.  That amount must have been payment by VP of Finance Bobby Jones to the Caddo Valley motel to satisfy the bid which Amy Hunnewell-Fitzroy, the secretary, conducted and completed without consulting Plaintiff (nor did she inform Plaintiff even a week after the hotel bid had been allocated).  By chance, PLAINTIFF stopped by to ask Tim Jones (in charge of Purchasing) some questions; he then told Plaintiff that the bidding process had been completed.  At first PLAINTIFF wanted the bid be redone.  But, to keep the enrollment up (195 participants total), the need was to have two sites in the Little Rock area, held at two different locations.  However, PLAINTIFF did not just randomly make this decision on her own.  A map of Arkansas with a dot representing each academy applicant's home address was created to show that the majority of 2014 academy applicants (by far) were from the Little Rock area.  With the Arkansas map visual graphic in hand, PLAINTIFF

first got approval from Dr. Andre Guerrero to have two sites in the Little Rock area (thus not having an HSU on-campus site for the first time).   Next, PLAINTIFF went to meet with Bobby Jones, then Tim Jones, then Vickie Jones (due to academy faculty staying at the B&B), and then Dr. Judy Harrison and Dr. Celya Taylor (met both together).   After meeting with these individuals, PLAINTIFF got busy and found a second academy site location in Little Rock.

24. Defendant claimed Plaintiff made "duplicate payments and reimbursements." The secretary was responsible for submitting the paperwork for payment for all supplies, travel, and reimbursements.   Any duplicate payments regarding invoices, travel, and/or reimbursements would be the result of her oversight mistakes/errors.   PLAINTIFF did not micro-manage the secretary's job responsibilities.   However, the public was led to believe Plaintiff did this intentionally through statements to the media and the Division of Legislative Audit.

25. Defendant claimed Plaintiff made inappropriate expenditures on conferences. Regarding conferences, instructions were given to take Christine Smart's expenses from Center funds.   Her expenses were taken from academy funds. Christine's point of departure was from Arkadelphia whereas mine was from Hot Springs.   Christine usually attended just the main part of the conference. However, PLAINTIFF was part of the conference set up for the pre-conference and conference. As an ARKTESOL (state ESL organization) board member

since 2000, PLAINTIFF arrived the day before the pre-conference/ conference to work with other board members to stuff conference bags and other tasks to finalize the setup for the pre-conference/conference.   The *request for full reimbursement* has been the standard procedure since 2000 when PLAINTIFF first started submitting TR1 forms for travel and reimbursement.

26. Until seeing this audit report, PLAINTIFF was not aware of duplicate payments or irregularities of travel and per diem overpayments.   PLAINTIFF relied on the secretary to accurately complete the paperwork for payments regarding invoices, travel, and reimbursements.

27. Plaintiff claimed **"$60 reimbursement to the Director for personal expenses".** Plaintiff was surprised when PLAINTIFF saw the listing of $60.00 reimbursement for personal expenses.   PLAINTIFF exclaimed a big "What?"   Her attorney had requested from DLA a breakdown of the $1,665.00 due to over reimbursement. PLAINTIFF received that itemized breakdown on 12-18-14, which PLAINTIFF intend to pay.   Regarding travel, PLAINTIFF did think that PLAINTIFF was allowed one-day travel expenses to/from distant conferences.   Again, PLAINTIFF also arrived one day early to assist in set up.   However, PLAINTIFF will not contest these numbers.

28. Again, PLAINTIFF was alarmed when PLAINTIFF saw that the $60.00 "credit card slip from a dental office submitted as documentation for a fuel

reimbursement" on 6-20-14.  Another big, "What?" escaped from her mouth.

Please note that the last day in her office at the Jane Ross House had been on

June 6, 2014.  From June 7-26, 2014, PLAINTIFF was in Little Rock for the 2014

ESL Academies and the Revisited Days 1-4.  PLAINTIFF returned to her office

on June 27, 2014.  Amy Hunnewell-Fitzroy, the secretary, was at the Center for

three plus weeks on her own.  According to the itemized list, she submitted the

$60.00 credit card slip from a dental office for a gas reimbursement on June 20,

2014.   Why would Amy submit a dental receipt for a gas reimbursement is

beyond Plaintiff!  Obviously, this was a mistake, but she made no attempt to

contact Plaintiff for clarification.  By then, the planning for the "audit ambush" was

already in action.  Amy also never informed Plaintiff that the two ASU people had

"toured" the Center while PLAINTIFF was in Little Rock managing the 2014 ESL

Academy and Revisited Days 1-4.

29. Each year, PLAINTIFF strived to enhance the upcoming academy through

additions to support the training being received.  One strategy tool recommended

by a couple of academy presenters was to have a meaningful, concrete reminder

(a tangible object) to incorporate rhyme, rhythm, chants, songs, and music into

the curriculum. The meaningful, tangible object would be the trigger to reinforce

the concept of incorporating elements of music into lesson planning and

teaching.  Her new, bright idea for the 2012 ESL Academy was to establish a

music CD as the meaningful, music-trigger reminder.  PLAINTIFF thought that

approaching the business owner, who was also the band manager, would be OK.

PLAINTIFF did not hide the fact that her son was a part of the band.  PLAINTIFF shared this with all.   The music CD was a part of the list that academy participants received showing all of the resources received during the academy. This list was posted in the CLP (the Center) file on the M drive on the HSU server, which is accessible to HSU faculty and staff.  PLAINTIFF had never heard/seen the term *related party transactions* until PLAINTIFF read the audit report.  If PLAINTIFF knew then what PLAINTIFF know now, PLAINTIFF would have done differently.

30. Since 2004, Joe A. Correia, her husband, has been hired annually by Dr. Andre Guerrero, ADE, as an official ESL Academy presenter.  Joe was responsible for the classroom technology segments.   His academy presentations and topics have been listed on the academy schedules each year (which were also posted in the CLP file on the M drive on the HSU server, which is accessible by HSU faculty and staff).  Dr. Guerrero has always paid the academy presenters through the Southeast Arkansas Education Service Cooperative.

31. As was done for all of the ESL Academy presenters year-after-year, requested supplies, books, and materials were purchased from the academy budget.  This included Joe's materials as he was one of the ESL Academy presenters. PLAINTIFF purchased Joe's materials through a distributor company which agreed to market Joe's materials on an as-needed basis.   The materials purchased for Joe's presentations for the academy participants were a part of the

list that academy participants received on the last day of the ESL Academy and showed at-a-glance all of the resources received during the academy.  This list was posted in the CLP (the Center) file on the M drive on the HSU server, which is accessible to HSU faculty and staff.  Again, PLAINTIFF had never heard/seen the term *related party transactions* until PLAINTIFF read this audit report.  Again, if PLAINTIFF knew then what PLAINTIFF know now, PLAINTIFF would have done differently.

32. The presenters of the ESL Academy were invited by Dr. Andre Guerrero to participate in the face-to-face teacher-training each June year-after-year.  Dr. Andre Guerrero invited/asked Joe to begin presenting at the ESL Academy in 2004 and has continued to offer the invitation year-after-year through the 2014 ESL Academy.

33. Again, to enhance the academy training and to support the TESOL teacher-preparation standards relating to diverse classroom environments, her bright, new idea for the 2014 ESL Academy was to purchase a global diversity poster that PLAINTIFF had displayed for several past years at both academy sites.  Since the poster had always captivated academy participants' attention, PLAINTIFF realized that receiving the poster as part of their academy resources, participants could immediately use the posters as world-culture tools to display in their classrooms to assist in creating a multicultural, global-diversity room environment.  Not knowing the invoice process, PLAINTIFF went to Tim Jones, in charge of the Purchasing Department, to discuss how to purchase student-

created artwork.   PLAINTIFF pursued this information herself; by then, PLAINTIFF was not trusting the secretary, Amy Hunnewell-Fitzroy, since she had overstepped her bounds and completed the hotel bidding without her knowledge and had not informed Plaintiff.   With each step, PLAINTIFF was just trying to get done what needed to be done.   The fact that the creator/designer of the poster artwork was the daughter of her assistant director did not seem relevant. PLAINTIFF was acknowledging that the artist was earning her way through college by working part time and by qualifying for scholarships (one of which was an art-related award).   Christine Smart, her assistant director, was not consulted; she had nothing to do with purchasing the posters for academy participants. PLAINTIFF approached her daughter (a university senior) directly.   Each ESL Academy participant was thrilled to receive the global poster—a huge success and an immediately useful tool.

34. Defendant claimed Violations of Procurement Laws.   Common knowledge from the HSU Purchasing Department has been that as long as an invoice is under $5,000.00 (now $10,000.00), then the purchase items do not have to go through a bid process.   Based on that information, purchases were below the required minimum to maintain simplicity.   Due to the usual time crunch in academy planning and wanting to continue working with dependable companies offering reliable services, lower professional/consumer-grade items were purchased for audio and video purposes for the ESL Academies year-after-year with the goal of being self-contained.     Equipment was upgraded as technology

developed/evolved over the years.  The daily academy training started early and ended late (10-12 hour teacher-training days meant 12-14 hour work days for staff); we had to be self-supportive and self-contained to take care of audio/video demands to guarantee that the academy schedule flowed smoothly from the beginning to the end of each training day. Males have engaged in similar conduct, yet have not been terminated.

35. The 2014 Academy's Revisited Days 1-4, mainly for Little Rock school teachers, created an exceptional need for professional HD processing, which was beyond the academy budget.  That is why professional processing equipment was leased for the 2014 ESL Academy.  The results exceeded our expectations.  Dr. Andre Guerrero, ADE, attended the first two Revisited Days; he was astounded by the viewing quality and by the reactions and responses from the attending academy participants.   We discussed exploring viable options of delivery for future academies—exciting new possibilities.

36. Due to their reliable service and quality products, the same vendors have been used from year-after-year.  Each vendor was selected for specific equipment needs; each was given a list of specific items to be purchased or leased (2014).  The two vendors do know each other as is common among suppliers of specialized equipment in a relatively small, select market place, but they were approached separately.  Again, males have engaged in this conduct.

37. Defendant claimed Plaintiff inappropriately used and purchased Equipment and
Supplies.

38. Again, the terms *contractors* and *preliminary investigation* were never used in her
presence.   PLAINTIFF had no idea that their presence was the possible
beginning of an audit investigation.  As previously stated, the female just kept
repeating that she was a good friend and former colleague of President Jones
and that she had been asked to check on a few details.  PLAINTIFF answered
her questions; she would roll her eyes and whisper comments to the male.

39. On July 4, 2014 (a national holiday), at 8:25 a.m., PLAINTIFF received a cell
phone call from Dr. Steve Adkison, the new Provost and VP of Academic Affairs
(his fourth day on the job) saying that President Jones, who was on vacation, had
just called him with serious concerns about HSU property in her possession.  As
PLAINTIFF started to respond, Dr. Adkison cut Plaintiff off by saying that
PLAINTIFF had until noon to get all HSU property back on campus or else HSU
security would come to her house.  As an Arkansas native and a true Southerner,
hospitality is an important quality to display toward guests; due to her being gone
for weeks with the academy, her house was not in shape to receive company.
PLAINTIFF was appalled and panicky at the same time.  PLAINTIFF acquiesced
and merely stated, "You have certainly changed this day."  Dr. Adkison said that
as soon as we stopped talking on the phone, he was going to e-mail Plaintiff the
list of items to be returned; PLAINTIFF gave him her g-mail address.  PLAINTIFF

quickly woke up her husband Joe and told him of the demand. Since the day

was a national holiday, people who would normally be available to help were not.

Even U-Haul was not open to rent a moving vehicle. Joe and PLAINTIFF started

loading items into two vehicles. At 11:10 a.m. PLAINTIFF called Dr. Adkison

saying that PLAINTIFF lived in Hot Springs (a fifty-minute drive to HSU) and that

we were just leaving our driveway; we would be at the Center by 12:10 noon. Dr.

Adkison stated that Johnny Campbell, head of HSU campus security, would meet

us there.

40. Before any item was unloaded, PLAINTIFF asked Johnny Campbell to please

step inside the Pool House to see the equipment which had already been

through maintenance inspection and returned for storage until the next academy.

Johnny responded with a question of surprise, "Is that audio equipment?"

PLAINTIFF said, "Yes, we have a self-contained audio/video setup for the ESL

Academy." Joe and PLAINTIFF then unloaded the two vehicles and were ready

to return for a second load. Johnny made a phone call. We were instructed to

call him when we arrived back to the Center. Since PLAINTIFF had not yet

received the list that Dr. Adkison said that he would send to Plaintiff, PLAINTIFF

went to her office computer e-mail; sure enough, the list was there. PLAINTIFF

printed a copy of the list. By then, the time was after 1:00 p.m. We drove back

to Hot Springs and returned with a second load. We told Johnny that we still had

another load. Dark had arrived by the time we had unpacked the third load.

Johnny said for Plaintiff to leave the four laptops in her office chair; the other

items were left in the Pool House.   At sixty-six and sixty-nine years of age, Plaintiff and her husband were both sweaty and exhausted.   We did document the body bruises that appeared a couple of days later.   PLAINTIFF wondered *what* was the rush.   *Why* were we demanded to do this on a national holiday? *Why* were we not allowed to wait until Monday, a regular work day, at which time we would have people available to assist us, and we could obtain a moving vehicle?   After fourteen years of service to HSU, the accusatory, no-comments-allowed, right-this-minute demand was demeaning and disrespectful.

41. Defendant claimed Plaintiff purchased luggage for personal use with state money.   The wording *three-piece luggage set* was misleading and gives the impression that three sizes of suitcases were purchased.   In reality, only one small, portable container with wheels with two accessories (cloth pouch for shoes) was purchased for a portable office container for office supplies and academy paperwork during the 2014 ESL Academy in Little Rock.   The small suitcase was purchased at Wal-Mart for under forty dollars ($40).   PLAINTIFF needed a case on wheels to avoid having to carry heavy tote bags.   PLAINTIFF needed her academy files/supplies with Plaintiff since PLAINTIFF would be off-campus at one of the two Little Rock sites for the thirteen-day training and the following Revisited Days 1-4 for mainly Little Rock school teachers who could not begin the training until Day 5 of the academy due to the superintendent's decision to not release the teachers for the make-up snow days.

42. In an attempt to smear the Plaintiff, the words *supposedly* used in paragraphs two and three along with *neither lot…was verified* in paragraph four were disturbing.  A sense of urgency had dominated the return process; yet, nothing was officially checked in.  If HSU had money to hire "contractors," then money should have been made available to officially inventory items.

43. Defendant falsely accused Plaintiff of buying headphones, stamps, headphones, a camera, and other items for personal use with state money Again, just stating *Nikon camera* gives the image of a complex, professional camera with an intricate lens.  In actuality, the camera was a point-and-shoot Coolpix camera bought at Wal-Mart.  The camera was used by academy staff to take pictures during the academy.   Two containers of olive oil (used to meet dietary needs/requests for meals during the 2014 ESL Academy and Revisited Days 1-4; what was left was returned).   Plaintiff was also accused on inappropriately purchasing a Shark portable steamer, fabric steamer, and two irons (purchased two-three years ago; available as needed to get flags ready to hang around the ceiling of the academy training rooms and for use to prepare ESL international students' traditional costumes for display at both academy locations).

44. Plaintiff falsely accused of inappropriately purchasing office chairs.  Again, no one asked Plaintiff *why* office chairs had been purchased.  The idea was for the office chairs to be used during the academy, as needed, for tech and the laptop/e-mail area.  One chair was destined for her office in the Jane Ross

House.  The last time her office chair was repaired, PLAINTIFF was told that PLAINTIFF needed to get another office chair; the repairman said that the chair base would be beyond repair if it ever came apart again.  One office chair was to be offered to either/both her Assistant Director, who was using an office chair which she had brought from her home, and to the secretary (should she feel the need for an office chair upgrade).  The critical need for the office chairs, however, was in the computer lab.  The lab chairs which had been purchased and used since 2000 had unstable back-support plus wheels which would easily roll out from under someone sitting down unless the person held on to the chair seat while sitting down.  We have been fortunate over the years that no one has had a tail bone/spinal injury from hitting the floor when the chair slipped away while sitting down.  If the Assistant Director and/or the secretary did not choose to upgrade their office chairs, then the remaining office chairs would be used in the computer lab for chair safety reasons.  Some office chairs were still in boxes because we had not needed them all during the academy (although we had extras available if they had been needed).  The academy staff workers used the computer lab for academy preparation and post tasks.  Again, Plaintiff, a female, was held to different standards than males.

45. Plaintiff was accused of inappropriately purchasing computer equipment.  She did not; the new iPad was an upgrade from an older iPad, used for job-related purposes, and laptops had been available/used at the ESL Academy.  Part of the

maintenance program was to clean them before storage for the next year's academy.

46. Plaintiff was accused of inappropriately purchasing supplies. Amy Hunnewell-Fitzroy, the secretary, had been instructed to order enough supplies for the ESL Academy face-to-face teacher training and for academy needs throughout the year. The ESL Academy was an extensive, full-service program requiring a large amount of supplies. Whatever was left over was placed in the storage garage for future use.

47. Plaintiff was accused of inappropriately purchasing T-Shirts. In fact, staff T-shirts and crew shirts accumulated over twelve years due to many workers of various shapes and sizes. Worn items were replaced as needed. New colors were added as needed. Staff members wore the same color of shirt each day with a different color of shirt per day; this ensured that the staff's appearance was uniform and professional. At the end of the academy training and post work, staff workers returned their bundles of shirts for storage until next year.

48. Plaintiff was accused of inappropriately purchasing umbrellas. Umbrellas were bought in 2004 at a dollar store in Hot Springs. These umbrellas have been available at each academy from 2004-2013 at the on-campus site in case of rain; participants had to walk to/from the education center to the cafeteria for breakfast, lunch, and dinner.

49. Plaintiff was accused of inappropriately purchasing pedometers.  In fact, basic, inexpensive pedometers were distributed on Day 5 of the 2014 ESL Academy with the motivational theme "step it up" in academics and health.  Participants were encouraged to health-walk during the hourly ten-minute breaks throughout the ten-hour training days.

50. Plaintiff was accused of inappropriately purchasing pencil-sharpeners.  In fact, the electronic pencil-sharpeners are used year after year; divided between the two academy sites for the supply tables for academy participants.  After the academy teacher training in June, the pencil-sharpeners are stored in the storage garage until the next academy.

51. Plaintiff was accused of inappropriately purchasing televisions.  Televisions, located in each ESL classroom in the Jane Ross House, were purchased several years ago with Center funds, not academy funds.

52. With the audit report, the implication is that excessive purchases had been made based on the Center's needs with no mention of the demands of the ESL Academy.  This implication illustrates a lack of understanding of the differences in the terms *the Center* and *the ESL Academy*.  Both are separate programs with different funding sources.  With the exception of classroom televisions bought

with Center funds, the items listed here and throughout the report were purchased with academy funds for academy purposes.

53. With a near-million dollar program annually, academy purchases to meet the needs of the year-round functioning of the ESL Academy process were in alignment with the scope and magnitude of the academy program. We avoided waste and replaced items when worn out or broken. What was not used now would be used later. The ESL Academy face-to-face teacher-training supplied all materials, supplies, and resources for the presenters and teachers—whatever was needed to make the process and the experience successful.

54. Plaintiff was therefore inappropriately accused of spending state money. The Center is *not the source of funding* for the listed expenditures. The bulleted items are based on the needs of the ESL Academy year-round program and were purchased from academy funds. The purchases are in alignment with the scope and magnitude of the ESL Academy program. The expenditures listed represent three years of ESL Academies. Purchases were within the ESL Academy budgets.

55. The Center and the ESL Academy used both the HSU post office and the downtown post office. Books of stamps were kept on hand for convenience, as needed, for mailing papers and projects when using the downtown post office. The books of stamps were kept in the front office and in her office. The

expenditure represents three years of ESL Academies. Again, no one asked Plaintiff *why* stamps had been purchased.

56. Plaintiff was accused of inappropriately purchasing or using kitchen equipment. The kitchen in the Jane Ross House is used by both the ESL Academy program and the Center (intensive English program for ESL students).  Due to snack preparation for academy participants in past academy years and to food preparation for staff workers during the three days of on-campus academy set up each year (and for efficient use of work hours), the stove was used a lot.  When the stove's coils started failing, the need for a new stove was evident.  During the fall and spring semesters in the American culture course, cross-culture traditions were explored and compared and contrasted.  As part of the curriculum, students prepared traditional meals reflective of their native cultures.   In turn, staff prepared traditional American holiday meals to expand the ESL students' awareness and experiences in relation to American holidays, customs, and traditions.

57. When the Center for Language Proficiency was relocated to the Jane Ross House, the dishwasher in the kitchen was not operable.  During past academies when the lunch and dinner dishes from the presenters' meals had to be washed after each meal, the academy staff workers rotated the duty of washing the dishes by hand.  What a chore and what a mess!!!  Amy Hunnewell-Fitzroy, the secretary, suggested that a dishwasher be purchased; she committed to keeping

the kitchen dishes washed and put away during the fall and spring semesters with the ESL students.  During academy preparation and post work, the new, functioning dishwasher saved time, effort, and energy when prewashing all the academy dishes used for the presenters' meals which were delivered to the B&B.

58. Plaintiff was falsely accused of inappropriately purchasing snacks and supplies. These expenditures were within ESL Academy budgets for three years

59. Plaintiff was accused of inappropriately purchasing audio and video equipment. In fact, audio and video equipment was purchased for the ESL Academy, not for the Center, which is the intensive English program for ESL students.

60. After the equipment maintenance check following each academy, the equipment was stored in the Jane Ross complex until the next academy, except for a few pieces used in the Pool House during the fall and spring semesters.  Those pieces of equipment included:  speaker, stand, document camera, VHS/DVD player, two portable/lapel microphones, and sound gate for the lapel microphones to work—used exclusively in the ESL classes taught in the Pool House.  As previously stated, all other equipment (after maintenance following the academy training) was stored within the Jane Ross complex until the next academy.

61. In conclusion, Plaintiff was falsely accused.   PLAINTIFF has reasonable explanations on the purposes for each of the purchases listed for the ESL Academy:  luggage (one, small suitcase with wheels for a portable office for her use during the 2014 ESL Academy), olive oil (to meet dietary needs/requests during the 2014 ESL Academy; the leftovers were returned for use in the Jane Ross House kitchen, as needed), fabric steamer (available for flags and traditional clothing as displayed in past academy years), groceries (purchased and prepared for prep and post meals for efficient use of work hours), cookware (purchased and used to prepare food for ESL Academy and Center needs; the pots and pans are stored in the Jane Ross House kitchen to the right of the stove). But Plaintiff's explanations were never publicized.

62. PLAINTIFF was never asked about written documentation regarding the proper use of grant funds through the ESL Academy program.  The Center, which is the intensive English program for ESL international students, did not operate through grant funding; the Center functioned from the income generated from the ESL costs paid by students for ESL classes each semester and the less than $3000.00 for travel and supplies and services from the HSU budget per fiscal year.

63. Defendant claimed "The financial statements were not approved by HSU management."  The statement that HSU never approved the academy financial reports is NOT true.  Every year (without exception) PLAINTIFF got a tuition

quote per credit hour directly from VP of Finance Bobby Jones for the Projected Budget Overview for each academy year, which was then sent to Dr. Andre Guerrero, ADE.  Every year (without exception), the final report was presented to Bobby Jones and/or Cathy Bell/Lecia Franklin, and then sent to Dr. Andre Guerrero, ADE.  The line item of interest from HSU Finance was the total of the carryover.  PLAINTIFF never submitted any academy financial paperwork to Dr. Andre Guerrero, ADE, without first taking the paperwork to the HSU Finance Department (Bobby Jones, Cathy Bell, Lecia Franklin).

64. The summary statements/totals would have been altered/different if PLAINTIFF had been interviewed or if her written responses were to have been available/taken into consideration before the final audit report was printed.

65. This audit process was started by President Jones, who never visited the Center, and was only at the 2013 ESL Academy for a brief welcome address for the on-campus site in the Education Center.  Not one question was asked to Plaintiff by President Jones or any other individual in HSU administration.  No one asked Christine Smart anything either.

66. This process has negatively impacted her life and has negatively altered her career.  The same is true for Christine Smart.  The results could have been dramatically different had PLAINTIFF been interviewed for this audit report.  PLAINTIFF has been the director of the ESL Graduate Academy year-round

program for twelve years (2003-2014) as well as being the founding coordinator of the Center for Language Proficiency for fourteen years (2000-2014). PLAINTIFF had totally focused her existence these past fourteen years on her work at Henderson.  PLAINTIFF has pushed family and friends aside to do what PLAINTIFF considered her life's purpose.  Her work ethnic has always been, "Do whatever is necessary to get the job done and done well.  PLAINTIFF naturally has a Type B personality, but PLAINTIFF works like a Type A.  PLAINTIFF had planned to work for another ten years at HSU.  Not only has that dream been demolished, all that has been accomplished during her stay these the past fourteen years has been erased.  All of this was done without HSU asking Plaintiff a single question.   Plaintiff has been denied Due Process and discriminated against Plaintiff on account of her gender by terminating her and paying her less.

67. Plaintiff was treated differently than males.  She was forced to return items on July 4, 2014—a trauma-filled national holiday—enforced by President Jones, who was himself, on vacation, and used his new Provost and VP of Academic Affairs to issue the 8:25 a.m. threat to return the HSU property by noon or else HSU campus security "would come to her house".  No explanations from Plaintiff were allowed.

68. Joe and PLAINTIFF arrived at the Jane Ross House complex about 12:10 noon with the first load.  Before they began unloading the items into the Pool House,

PLAINTIFF asked Johnny Campbell, head of HSU campus security, to step inside the Pool House to see the equipment that had already been checked for maintenance and returned before the July 4th ultimatum.  He was surprised to see the audio equipment and to learn that we had a full audio/video set up for the ESL Academy program.

69. Since the day was a national holiday, our friends and family were either out of town or working.  No one was available to help Joe and Plaintiff.  After three trips in a borrowed van and our vehicle to/from HSU (fifty-minute drive each way), Joe and PLAINTIFF had to stop.  At sixty-nine and sixty-six respectively, we had done physical labor all day long—from morning until past dark.  Joe documented his body bruises which surfaced a couple of days later.

70. Plaintiff was fired in a way that made the newspaper and local televised news reports, and has left allegations in her personnel file that has damaged Plaintiff, both in her public standing and in trying to find other jobs.

71. Plaintiff was referred to the prosecutor using information obtained from her without proper Garrity rights, and a State Police Investigation was ordered by an unknown authority.

72. Plaintiff has been emotionally devastated by her termination.  Plaintiff has lost wages and reputation, and has been unable to obtain work, despite applying for

related employment. By the shortened employment as a result of the illegal actions of the Defendant, Plaintiff's Social Security and Retirement have been diminished.

73. Plaintiff asked for a name-clearing hearing.  She has been deprived of her liberty interest in the reputation and her property interest in her contract with Due Process.

74. Defendant has not responded to Plaintiff's request for a name clearing hearing.

<u>COUNT I DUE PROCESS</u>

75. Plaintiff re-alleges the foregoing as if fully set out herein.

76. Plaintiff requested a name-clearing hearing before filing this lawsuit.

77. Defendant had publicized information leading the public to believe that Plaintiff has misused state money.  However, this was not true, and Plaintiff has been stigmatized in the community as a result of several newspaper articles and televised reports.  Furthermore, Plaintiff is entitled to an injunction requiring the State not to use information obtained in violation of <u>Skinner</u>.

78. Indeed, Plaintiff requested a name-clearing hearing, but she was not allowed one, much less the opportunity to present witnesses, nor cross-examine the decision-makers in this case.

79. Consequently, Plaintiff has been denied an effective name-clearing hearing.

80. As a direct and proximate cause of the denial of a name-clearing hearing, Plaintiff has been denied due process, and has suffered severe mental and emotional distress, loss of reputation, and incurred other damages in an amount to be proven at trial. Damage to reputation is irreparable, and Plaintiff is entitled to immediate injunctive relief.

## COUNT II

81. Plaintiff re-alleges the foregoing as if fully set out herein.

82. Plaintiff has sustained damages in the form of lost wages, benefits and other remuneration.

83. Plaintiff was a public employee with a property interest by virtue of her contract.

84. Defendants took an adverse action Plaintiff by terminating her without adequate pre-deprivation or post-deprivation Due Process.

## COUNT III

85. Plaintiff re-alleges the foregoing as if fully set out herein.

86. Furthermore, the Defendant fired Plaintiff under circumstances similarly situated males were not. Plaintiff has a clearly established right to be free from gender

Discrimination and has suffered illegal discrimination in violation of the Equal Protection Clause.

DAMAGES

87. As a direct and proximate cause of her termination and the violation of the laws detailed above, Plaintiff has been denied due process, and has suffered severe mental and emotional distress, loss of reputation, and incurred other damages in an amount to be proven at trial.  Damage to reputation is irreparable, and Plaintiff is entitled to immediate injunctive relief.

WHEREFORE, Plaintiff prays for appropriate compensatory damages and punitive damages, for an injunction requiring that the Defendant allow Plaintiff an effective name-clearing hearing, to include, but not limited to, a right to present witnesses, and cross examine the witnesses in a public forum, for declaratory judgment that Plaintiff was not afforded a name clearing hearing, for a trial by jury, for an injunction requiring the Defendant to modify its policy, for a reasonable attorney's fee, for costs, for reinstatement and for all other proper relief.

Respectfully Submitted,

SUTTER & GILLHAM, P.L.L.C.
Attorneys at Law

P.O. Box 2012
Benton, AR 72018
501-315-1910  Office
501-315-1916  Facsimile
Attorney for the Plaintiff

By:  /s/ Luther Oneal Sutter
Luther Oneal Sutter, ARBN 95031
luthersutter.law@gmail.com


By:  /s/ Joseph Churchwell
Joseph Churchwell ARBN 2005057
Churchwell Law Offices INC.
PO BOX 2498
Benton AR 71208
(501) 255-5563
Fax: (501) 315-1916
churchwell.law@gmail.com